FERNANDO HERNANDEZ, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 36859

August 2, 2002                                    50 P.3d 1100

[Rehearing denied September 5, 2002]

*JoNell Thomas*, Las Vegas, for Appellant.

*Frankie Sue Del Papa*, Attorney General, Carson City; *Stewart L. Bell*, District Attorney, *Lynn M. Robinson*, Chief Deputy District Attorney, and *Robert J. Daskas*, Deputy District Attorney, Clark County, for Respondent.

----

516

## OPINION

*Per Curiam:*

Appellant Fernando Hernandez was convicted of, among other things, first-degree murder for stabbing his ex-wife to death and second-degree kidnapping for taking their three-year-old daughter immediately after the murder. He received a death sentence.

Hernandez does not dispute that he killed his wife but claims that his conviction is invalid due to numerous errors, including that he cannot be convicted of kidnapping his own daughter. We conclude that none of his claims warrant relief and affirm his conviction and sentence.

## FACTS

Hernandez and Donna Hernandez were married on October 6, 1991, and their daughter Ana was born in February 1996. In October 1998, the marriage ended in divorce. Ana lived with Donna, but Hernandez was permitted custody of Ana from 8 a.m. on Wednesdays until 5 p.m. on Fridays.

Francisco Landeros rented a room from Donna from late August until mid-December 1998. He and Donna were friends but did not have a romantic relationship. During that time, Hernandez left insulting messages on Donna's answering machine, calling her a whore and a fool. Landeros testified that a couple of times Hernandez threatened to kill her.

In January 1999, Donna informed the Las Vegas Metropolitan Police Department (LVMPD) of a threat. She was very upset and excited, reporting that when she went to pick her daughter up from Hernandez, he said that he would "make her life very sorry" and was going to take Ana to Mexico. Donna feared for her own safety.

In March 1999, Landeros gave Donna a ride home from work in his pickup one evening. When they got to the house, Hernandez was there in his car and drove toward them. Landeros was forced to pull to the side of the road to avoid him. Donna activated the garage door opener, and Landeros drove into the garage. As the garage door was closing, Hernandez drove under it, causing it to open again. He got out of his car and tried to hit Landeros. Landeros grabbed and held Hernandez, who pleaded to be let go so he would not get in trouble with the police. After Landeros let Hernandez get back into his car, Hernandez threatened to kill Landeros and said "you're going to die, dogs." Late that same night, Hernandez called Donna's mother three times. He threatened to kill Donna. He also said that he had money in Mexico and was going to take Ana there to raise her because Donna was an unfit mother.

Immediately after these incidents, Donna obtained a protective order against Hernandez. She later had it extended until April 13, 2000. It was therefore in effect at the time of the subject offense in October of 1999.

About two weeks before Hernandez killed Donna, he told a friend that he wanted to kill her, their daughter, and himself. He was intoxicated at the time.

Around 7 a.m. on October 6, 1999, LVMPD Officer David Swoboda was driving an unmarked police car south on Highway 95 towards Laughlin, Nevada. A car passed him going well over the speed limit. Swoboda turned on his red lights and gave chase. The car reached a speed of 96 miles per hour and traveled about eight miles before Swoboda was able to pull it over. Hernandez,

who was driving the car, got out. He was crying, raised his hands, and said, "just shoot me, just kill me." He walked around the car to the passenger side and said, "I'm sorry, baby." Because of his unusual behavior, Swoboda handcuffed him and placed him in front of the police car.

Swoboda went to Hernandez's car, where Ana sat in a car seat in the back, crying. He tried to calm her and then returned to Hernandez and obtained his driver's license. He noticed that Hernandez had cuts on his face and hand and asked him what happened. Hernandez said that he had fought with his ex-wife. Swoboda learned through his police computer of Donna's protective order against Hernandez, so Swoboda suspected a domestic violence situation and requested that officers be sent to Donna's home.

LVMPD Detective Tom Allen arrived at the scene of the confrontation with Hernandez. Swoboda left Allen with Hernandez and returned to Ana. He noticed a blood stain on the seat near her. She was still crying and said, "[D]addy hurt mommy real bad."

Hernandez smelled of alcohol and admitted to drinking three beers. He failed a horizontal gaze nystagmus test administered by Detective Allen and was placed under arrest. Swoboda put him in his police car. Hernandez alternated between calm and almost hysterical moments. He asked to kiss Ana goodbye. Allen brought her to him, Hernandez kissed her, and Allen took her away. Hernandez began crying and said, "I killed them" and "I killed her." Swoboda advised Hernandez of his *Miranda* rights, and Hernandez continued to say, "I killed them" and "I killed her."

Detective Allen found some children's clothing and underwear in Hernandez's car and noticed bloodstains on the pajamas that Ana was wearing. Allen eventually took her to his vehicle where she told him that her father had hurt her mother on the stairs. Ana also told him that she and her father were going to Mexico.

Hernandez was driven to the police facility in Laughlin, and analysis of his breath showed blood alcohol levels of 0.165 and 0.154 percent. He was then driven to the Clark County Detention Center. During the drive he acted erratically, sometimes yelling and crying. At one point he tried to jump out of the moving vehicle. He stated that his life was over and asked the police officer to shoot him. After Hernandez was in the booking area at the jail, he began to hit the back of his head against the concrete wall behind the bench he was sitting on and had to be restrained. Property taken from Hernandez included, among other things, a ring from his right hand and over $1,000 in cash.

LVMPD officers went to Donna's residence, broke open the door, and found her body lying on the stairs. There was blood all over the body and the walls by the stairs, and a broken knife lay nearby. There was no sign of forced entry (other than by the

police), and the home otherwise appeared undisturbed. A crime scene analyst found blood elsewhere in the house, including around the kitchen sink. The broken knife by Donna's body was a kitchen knife with a seven-and-a-half-inch serrated blade. Another analyst identified a palm print taken from the knife as Hernandez's. DNA analysis of the blood found at the crime scene showed it to be both Donna's and Hernandez's. Donna's blood was also found on Ana's pajamas and on the ring taken from Hernandez.

The autopsy showed that the cause of Donna's death was strangulation, with significant contributing conditions including multiple stab and slash wounds and blunt head trauma. Some of the bruises on Donna's neck were caused by fingers and others by an object such as a foot or knife placed against her neck. She suffered numerous contusions on her body and face and numerous defensive slash wounds on her hands. A stab wound in the area of her heart pierced her left lung, striking a rib in the back; stab wounds to each side of her neck penetrated into the area of the carotid arteries. It appeared that Hernandez was able to inflict these three major wounds to such vital areas because Donna had ceased to struggle against the attack. Finally, the autopsy revealed the tip of the handle of a dinner knife protruding from her vagina. The knife had been thrust to the left of the cervix, perforating the vaginal wall and penetrating into the abdominal cavity. This last wound caused minimal hemorrhaging and likely occurred after Donna's death.

Hernandez presented the following evidence. In April 1999 he alleged to Child Protective Services (CPS) that Landeros was sexually molesting Ana. However, an investigation proved the allegation groundless.

The director of Ana's preschool testified that a couple of days before Donna's murder she saw Donna and Hernandez together at the preschool. She was surprised because she knew that they did not get along. She did not know whether they had driven there in the same car. The director said that Hernandez usually picked Ana up on Wednesdays, but occasionally, if Donna called first to give the preschool her approval, he picked her up on a different day.

Nelly Hernandez, a friend of Hernandez's, testified that she helped him with translations during his divorce and custody proceedings. Hernandez was upset because he still wanted to be married and have his family together. He was also upset when he filed his complaint with CPS against Landeros. After Hernandez's arrest, Nelly went to his house to gather his belongings. She did not see any blood or signs that he had been packing, and she recovered his passport and Ana's birth certificate from the house. Another friend, Juan Trillo, testified that in the month before

Donna's murder, Hernandez repeatedly said that he was trying to get Donna back. Trillo saw them together in Hernandez's car a couple of times. Trillo also went with Nelly to gather Hernandez's belongings and saw no blood or indications that he had been packing. Hernandez's neighbor testified that he had seen Donna at Hernandez's house a few times in the afternoon, but he could give no dates.

The prosecution and defense stipulated that the caller ID on Donna's telephone showed that a call was received from Hernandez's phone at 9:32 p.m. on October 5, 1999.

In rebuttal, the prosecution presented videotape of family court proceedings involving Donna and Hernandez in November 1998, soon after their divorce. In the proceedings, Hernandez expressed his desire to take Ana on vacation to Mexico. Donna told the court, "He tells me all the time that I'm a bad mother, and he's going to take my child away from me. I'm afraid of him."

On July 14, 2000, the jury returned verdicts finding Hernandez guilty of burglary while in possession of a weapon, first-degree murder with use of a deadly weapon, second-degree kidnapping, and unlawful sexual penetration of a dead human body.

During the penalty phase, the State presented victim impact evidence through the testimony of Donna's mother and brother and Ana's therapist. The evidence showed that Donna's murder had severely affected her brother, sister, mother, and father, but Ana had been particularly traumatized and would likely require therapy until she was sixteen to eighteen years old. Hernandez called a number of witnesses, including his brother, an employer, and friends and fellow workers. According to their testimony, he held multiple jobs, was hard-working, was polite and friendly, and was a loving and devoted father. Hernandez spoke in allocution.

At the end of the penalty phase, the jury found three aggravating circumstances: Hernandez subjected the victim to non-consensual sexual penetration immediately before, during, or immediately after the commission of the murder; the murder was committed while Hernandez was engaged in the commission of a burglary; and the murder involved the torture and/or mutilation of the victim. Seven mitigating circumstances were found: Hernandez had no significant history of prior criminal activity; he committed the murder while under the influence of extreme mental or emotional disturbance; he had accepted responsibility for the crime; he had expressed remorse for the crime; he was intoxicated at the time of the crime; he had been gainfully employed throughout his adult life; and he spared the life of his daughter even though he had threatened to kill her. The jury found that the aggravating circumstances outweighed the mitigating and returned a verdict of death.

## DISCUSSION

*1.  Juror misconduct: buying a gift for the murder victim's daughter*

Hernandez contends that a mistrial should have been granted because of juror misconduct. The following facts are pertinent.

The jurors returned guilty verdicts on a Friday, and the district court excused the jurors until the next Tuesday, when the penalty phase was to begin. As required by NRS 175.401, the court admonished them in the meantime not to talk among themselves or with anyone else on any subject related to the trial; not to read, watch, or listen to any report or commentary pertaining to the trial; and not to form or express any opinion on any subject connected with the trial.

Penalty deliberations began on Wednesday afternoon. At that time the district court informed the parties that the bailiff had learned that three jurors had bought a present for Ana and the court had instructed the bailiff to tell the jurors to set the present aside to be dealt with later. The court decided to wait until after a verdict was returned before it questioned the three jurors "whether they discussed the case or any facts of the case or discussed potential punishment or anything that jurors are precluded from discussing, when they made the decision to purchase a present for the child." After the jury returned a death sentence on Thursday, the court excused all but two jurors, and the following colloquy occurred.

> The Court:   Thank you. Miss Lorren and Miss Almond, I understand that the two of you along with one of the alternates who is not with . . . us anymore, purchased a gift for the minor child, Ana Hernandez, and if you have that, you may certainly give that either to the grandmother or to the district attorney to transfer to the grandmother. However, we do have to know, because we give you this admonishment that you can't talk to each other, you can't discuss the trial or any of the facts, etc., etc., I do have to ask you how it was that you decided . . . to go together to purchase a present for the child.
>
> Juror Lorren:   The day that we were here all day on Friday, we were walking out, and I think it was Amber that said I wish we can get something for Ana. I said, why don't we do that, and we took Traci [Almond] because she has a little girl too about the same age. We just got the sizes of clothes. We didn't talk about the trial at all.

. . . .

> The Court: [Miss Almond, is] that your recollection of how that happened, and you tell us that you did not discuss the trial at all?
>
> Juror [Almond]: No. We basically discussed what would fit her and what we thought was cute.

Defense counsel also questioned the two jurors and then moved for a mistrial, which the court denied.

Hernandez contends that the jurors violated the admonition not to talk about the case. He also contends that the presence of the gift in the jury room during deliberations was prejudicial error.

"It is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body."[1] The record does not support appellant's claim that the jurors discussed the case prematurely. Hernandez asserts that discussing the child of the victim necessarily constituted a discussion about the case, but based on the jurors' testimony, we do not agree.

Even if the jurors' behavior was misconduct, not every incidence of juror misconduct requires a new trial.[2] If it appears beyond a reasonable doubt that no prejudice occurred, a new trial is unnecessary.[3] The question of prejudice is a factual one for the district court, and this court will not reverse absent an abuse of discretion.[4] Intra-jury discussions are far less of a threat to a defendant's right to trial by an impartial jury than are extra-jury influences.[5] Here, the facts do not establish prejudice but merely demonstrate that the jury was sympathetic to an innocent child, who was a collateral victim of the murder. We conclude that the district court did not abuse its discretion and that the record indicates beyond a reasonable doubt that no prejudice occurred.[6] Further, we conclude that Hernandez fails to show that the presence of the gift constituted plain error or affected his substantial rights.[7]

---

[1] *U.S. v. Resko,* 3 F.3d 684, 688 (3d Cir. 1993).

[2] *Tanksley v. State,* 113 Nev. 997, 1003, 946 P.2d 148, 151 (1997).

[3] *Id.*

[4] *Id.*

[5] *Resko,* 3 F.3d at 690.

[6] *Cf. Lewis v. State,* 94 Nev. 727, 729, 588 P.2d 541, 542 (1978).

[7] *See* NRS 178.602 ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

## 2. Appellant's kidnapping conviction for taking his own daughter

Hernandez asserts, as he did below, that it is impossible for him to be convicted of kidnapping his daughter. Hernandez attacks the applicability and validity of the kidnapping statute in a number of ways.

NRS 200.359(1)(a) provides that it is a category D felony for a parent with no right of custody or a person having a limited right of custody to a child to violate a court order and remove the child from a person having lawful custody. Hernandez argues that this statute is more specific than and takes precedence over NRS 200.310, which proscribes kidnapping as either a category A or B felony, but does not explicitly address the taking of a child by a parent with limited custody. He claims that application of NRS 200.310 to his case violated his rights to due process, equal protection, and a fair trial. We conclude that this argument lacks merit.

Hernandez has not shown that NRS 200.359 and 200.310 are in conflict, and this court has never treated such statutes as conflicting. The matter at issue here involves not conflicting statutes but prosecutorial discretion in charging. We have followed the United States Supreme Court's holding ''that neither due process nor equal protection were violated under federal constitutional principles by virtue of the fact that the government prescribed different penalties in two separate statutes for the same conduct.''[8] ''[A] defendant's rights are adequately protected in this area by the 'constitutional constraints' on a prosecutor's discretion, which prevent the prosecutor from selectively enforcing the law based on such unjustifiable criteria as race or religion.''[9] This court has also stated that ''where conviction for multiple offenses might be redundant, accepting [a guilty plea without the State's approval] undermines prosecutorial discretion in charging and the state's interest in obtaining a conviction on the other charges, which may be the more 'serious' charges.''[10] We conclude that the prosecutors acted within their reasonable discretion in charging kidnapping here.

In addition, Hernandez invokes the rule of lenity. This rule calls for the liberal interpretation of criminal statutes to favor the

---

[8]*Sheriff v. Killman*, 100 Nev. 619, 621, 691 P.2d 434, 436 (1984) (citing *United States v. Batchelder*, 442 U.S. 114 (1979)).

[9]*Id.* (quoting *Batchelder*, 442 U.S. at 125).

[10]*State of Nevada v. Dist. Ct.*, 116 Nev. 127, 139 n.10, 994 P.2d 692, 700 n.10 (2000).

accused in resolving ambiguities.[11] But NRS 200.310, the kidnapping statute, applies unambiguously to Hernandez's actions—he simply wants NRS 200.359 applied instead. Hernandez further argues that the State was equitably estopped from prosecuting him under NRS 200.310 rather than NRS 200.359; however, his authorities are not apposite, and his argument is meritless.

Hernandez also claims that NRS 200.310 is unconstitutionally vague. Statutes enjoy a presumption of validity, and the burden is on the party attacking them to show their unconstitutionality.[12] A statute violates due process if it is so vague that it fails to give persons of ordinary intelligence fair notice of what conduct is prohibited and fails to provide law enforcement officials with adequate guidelines to prevent discriminatory enforcement.[13] Where, as here, First Amendment interests are not implicated, the challenged statute must be shown to be impermissibly vague in all its applications or at least as applied to the defendant in question.[14] NRS 200.310(2) provides in relevant part that "[a] person who willfully and without authority of law seizes . . . another person . . . for the purpose of conveying the person out of the state without authority of law, . . . is guilty of kidnapping in the second degree." Hernandez fails to show that this language did not provide him with fair notice that his conduct in taking Ana was criminal, let alone that the statute is vague in all its applications.

Finally, Hernandez argues that it was a legal impossibility for him to kidnap Ana because upon Donna's death he became Ana's sole legal custodian. Although this court did not decide this issue in *Sheriff v. Dhadda*,[15] that case supports the proposition that a parent having legal custody of a child can nevertheless be convicted of kidnapping the child. In *Dhadda*, we concluded that there was sufficient evidence under NRS 200.310(1) to prosecute a mother for kidnapping her own daughter because the State "demonstrated . . . probable cause to believe that [the mother] took [the daughter] to the river for the purpose of killing her or inflicting substantial bodily harm upon her."[16] In this case, Hernandez acted without authority of law in taking Ana because he violated a protective order, a custody decree, and criminal

---

[11]*State v. Stull,* 112 Nev. 18, 23, 909 P.2d 1180, 1182 (1996).

[12]*Sheriff v. Vlasak,* 111 Nev. 59, 61-62, 888 P.2d 441, 443 (1995).

[13]*Id.*

[14]*Republic Entertainment v. Clark County,* 99 Nev. 811, 816, 672 P.2d 634, 638 (1983); *Lyons v. State,* 105 Nev. 317, 320, 775 P.2d 219, 221 (1989).

[15]115 Nev. 175, 980 P.2d 1062 (1999).

[16]*Id.* at 183, 980 P.2d at 1067.

statutes when he murdered Donna and took Ana.[17] We conclude that his status as sole surviving parent of Ana once he murdered Donna did not render his seizure of Ana lawful.[18]

### 3. Prosecutorial misconduct

Hernandez contends that prosecutorial misconduct occurred at his trial in the form of numerous instances of improper comments. The relevant inquiry is whether a prosecutor's statements so infected the proceedings with unfairness as to make the results a denial of due process.[19] The statements should be considered in context, and "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."[20] Although some of the prosecution's comments were improper, none so infected either the guilt or penalty phase with unfairness as to deny Hernandez due process.

#### A. Unpreserved challenges

Hernandez failed to object to most of the instances of misconduct that he now alleges. Generally, for this court to consider whether a prosecutor's remarks were improper, the defendant must have objected to them at the time, allowing the district court to rule upon the objection, admonish the prosecutor, and instruct the jury.[21] Under NRS 178.602, this court may nevertheless address a claim if Hernandez can show that it was plain error that affected his substantial rights. We conclude that the unobjected-to comments either were not erroneous or did not amount to plain error.

#### B. Preserved challenges

During the penalty phase, the prosecutor told the jury that she "disagree[d] with" a witness called by the defense. Hernandez says that this was an improper statement of opinion. Because defense counsel immediately objected to the comment and the district court sustained the objection, we conclude that no reversible error occurred.[22]

---

[17]See NRS 200.310(2) (prohibiting seizures of other persons "without authority of law").

[18]Cf. NRS 41B.250-.300 (providing that the felonious, intentional killer of a decedent forfeits any interest in the estate of the decedent).

[19]Darden v. Wainwright, 477 U.S. 168, 181 (1986).

[20]United States v. Young, 470 U.S. 1, 11 (1985).

[21]Riley v. State, 107 Nev. 205, 218, 808 P.2d 551, 559 (1991).

[22]See, e.g., Manley v. State, 115 Nev. 114, 124, 979 P.2d 703, 709 (1999) (concluding reversal not warranted where appellant objected immediately to improper question and district court sustained the objection and struck the question).

Also in the penalty phase, the prosecutor argued that evidence of uncharged domestic abuse by Hernandez was relevant in considering the alleged mitigating circumstance of no significant criminal history. Defense counsel objected that such bad acts could not enter into the jury's weighing of aggravating and mitigating circumstances, and the district court sustained the objection. Hernandez claims that the prosecutor misstated the law and purposefully misled the jury on the use of this evidence.

During a penalty phase, the State may properly present evidence for just three purposes: "to prove an enumerated aggravator, to rebut specific mitigating evidence, or to aid the jury in determining the appropriate sentence after any enumerated aggravating circumstances have been weighed against any mitigating circumstances."[23] We conclude that the prosecutor's argument was an appropriate attempt to employ the evidence of domestic abuse to rebut the specific mitigating circumstance of no significant criminal history asserted by the defense.

Finally, the prosecution argued during the penalty phase that Hernandez "didn't tell Sergeant Swoboda out on U.S. 95 that he was sorry to Ana for taking her mother away . . . [or] that he apologized to the Griego family because they would never have another holiday with their daughter." Defense counsel objected, and the district court sustained the objection. Hernandez challenges this argument on two grounds. First, he contends that it is improper to argue that a defendant is worthy of death because he has not shown remorse. In this case there was no error because the prosecutor was fairly responding to an earlier contention by defense counsel that Hernandez expressed remorse after he was first stopped.[24] Second, Hernandez is correct that arguments that a family will have no more holidays with the murder victim are improper because they are aimed only at the jury's emotions and encourage it to impose a sentence under the influence of passion.[25] Therefore, the last part of the prosecutor's argument was improper, but objection was immediate and sustained by the court, and we conclude that no prejudice resulted.

### 4.  Jury instructions

Hernandez claims that numerous jury instructions were erroneous. He failed to object to many of them at trial.

---

[23]*Hollaway v. State,* 116 Nev. 732, 746, 6 P.3d 987, 997 (2000).

[24]*See Sherman v. State,* 114 Nev. 998, 1016, 965 P.2d 903, 915 (1998).

[25]*Hollaway,* 116 Nev. at 742-43, 6 P.3d at 994.

### A. Unpreserved challenges

Hernandez failed to object to the following jury instructions which he now challenges: guilt phase instruction no. 26 defining felony murder; guilt phase instruction no. 27 defining murder by torture; guilt phase instruction no. 47 and penalty phase instruction no. 15 defining reasonable doubt; guilt phase instruction no. 55 and penalty phase instruction no. 22 directing the jury to do "equal and exact justice"; and penalty phase instruction no. 19 directing the jury not to be influenced by sympathy. Hernandez must demonstrate that there was error in regard to these instructions, that it was plain, and that it affected his substantial rights. He fails to do so.

Hernandez also challenges guilt phase instruction no. 32 on voluntary intoxication. Hernandez claims that he objected to this instruction below, while the State contends that he objected only to its final line. Our reading of the record reveals that defense counsel did not object to the instruction at all. Three alternative instructions were discussed, and defense counsel did not object to the instruction that the district court finally decided to give. Hernandez fails to show that the instruction given was erroneous in any way.

Hernandez also complains that the district court remarked that "[j]ury instructions are the purview of the appellate court" and that jurors would not understand the distinction between general- and specific-intent crimes, but he does not explain how this constituted error.

Finally, he asserts that there "appears to be" no authority to support guilt phase instruction no. 34, which provided that intoxication that follows the formation of a premeditated, deliberate intent to commit murder does not reduce the degree of murder. Although this instruction may be too broadly stated, Hernandez offers no analysis or authority demonstrating that it was plainly erroneous.

### B. Preserved challenges

Hernandez objected to guilt phase instruction no. 44, defining "deadly weapon." The instruction was based on NRS 193.165(5), which provides in part that "deadly weapon" means:

> (a) Any instrument which, if used in the ordinary manner contemplated by its design and construction, will or is likely to cause substantial bodily harm or death; [or]
> (b) Any weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death.

Hernandez contends that this definition is vague and ambiguous. He relies on *Zgombic v. State*.[26] In *Zgombic,* this court considered whether the Legislature intended a broad, functional definition of ''deadly weapon'' under a former version of NRS 193.165, which did not define the term.[27] We concluded that the statutory ''term 'deadly weapon' is indeed uncertain, and thus the broader functional interpretation is not warranted. . . . [T]he enhancement penalty for use of a deadly weapon in the commission of a crime pursuant to NRS 193.165 is limited to firearms and other instrumentalities that are inherently dangerous.''[28]

Hernandez fails to note that *Zgombic* preceded (and apparently prompted) the amendment of NRS 193.165 to include both a functional and an ''inherently dangerous'' definition of ''deadly weapon.''[29] Therefore, the statute is no longer unclear in this regard. The definition set forth in NRS 193.165(5)(b) is broad, but that is clearly the Legislature's intent. The definition is not without limit, however; it requires an instrument to be ''readily capable'' of causing death as used, not that it simply caused death.

Because the statute does not implicate First Amendment interests, Hernandez has the burden to show that it is impermissibly vague in all its applications or at least as applied to him.[30] He does not meet this burden. Even using the stricter, ''inherently dangerous'' test set forth in *Zgombic* and NRS 193.165(5)(a), the knife that Hernandez used—a kitchen knife with a seven-and-a-half-inch, serrated blade—was a deadly weapon.[31] The statute gave Hernandez fair notice that the knife was a deadly weapon for purposes of sentence enhancement.

Hernandez also objected to instruction no. 35 in the guilt phase that informed the jury that it did not need to agree unanimously on the theory of first-degree murder as long as its verdict of first-degree murder was unanimous. He argues that this violates due process, but concedes that this court has already ruled otherwise.[32] We decline to reconsider this issue.

---

[26]106 Nev. 571, 798 P.2d 548 (1990).

[27]*See id.* at 573-76, 798 P.2d at 549-51.

[28]*Id.* at 575-76, 798 P.2d at 551.

[29]*See* 1995 Nev. Stat., ch. 455, § 1, at 1431.

[30]*Republic Entertainment,* 99 Nev. at 816, 672 P.2d at 638; *Lyons,* 105 Nev. at 320, 775 P.2d at 221.

[31]*See Steese v. State,* 114 Nev. 479, 499, 960 P.2d 321, 334 (1998) (approving a jury instruction that ''a large kitchen knife,'' a butcher's knife with a five- to seven-inch blade, was a deadly weapon as a matter of law); *Thomas v. State,* 114 Nev. 1127, 1146, 967 P.2d 1111, 1123 (1998) (following *Steese* in concluding that ''a meat-carving knife with a five- to seven-inch blade'' was a deadly weapon).

[32]*See, e.g., Evans v. State,* 113 Nev. 885, 894-96, 944 P.2d 253, 259-60 (1997).

Hernandez also objected to guilt phase instruction no. 15 on express and implied malice, which stated in part that malice ''may be implied . . . when all the circumstances of the killing show an abandoned and malignant heart,'' essentially the definition set forth in NRS 200.020(2). Hernandez argued that the language ''abandoned and malignant heart'' is archaic, vague, and ambiguous. In addition, Hernandez now challenges all the malice instructions, nos. 13, 14, and 15, arguing that they created an unconstitutional presumption, interfered with the presumption of innocence, and relieved the State of its burden to prove guilt beyond a reasonable doubt. These issues were not preserved below, and Hernandez does not demonstrate any plain error. As to whether implied malice is defined in impermissibly vague, archaic terms, this court considered and rejected this argument last year.[33]

In the penalty phase, Hernandez objected to instruction no. 11, which informed the jury that

> ''mutilate'' means to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect.
>
> In order for mutilation to be found as an aggravating circumstance, there must be mutilation of the victim beyond the act of killing.

Hernandez argued that the instruction was vague, ambiguous, and overbroad, making every cause of death ''mutilation.'' He makes two additional arguments on appeal: applying *Byford v. State*,[34] which held that mutilation can occur postmortem, to his case would be an improper retroactive application of law; and the mutilation aggravator duplicated the sexual-penetration aggravator. These last two issues were not preserved and do not have merit.

First, the aggravating circumstances in question are not duplicative. In this case, the same conduct gave rise to both the mutilation and the sexual penetration, but in other cases these two aggravating circumstances would likely be based on different facts since sexual penetration is generally accomplished without mutilation. This factor indicates that the aggravators are not duplicative.[35] So does a second factor: each aggravator addresses distinguishable state interests. One is apparently aimed at pre-

---

[33]*Leonard v. State,* 117 Nev. 53, 78-79, 17 P.3d 397, 413 (2001).

[34]116 Nev. 215, 994 P.2d 700 (2000).

[35]*See Geary v. State,* 112 Nev. 1434, 1448, 930 P.2d 719, 728 (1996), *clarified on rehearing,* 114 Nev. 100, 952 P.2d 431 (1998).

venting disfigurement, the other at preventing sexual abuse and perversion.[36] We conclude that the gravamen of each aggravator is different and that basing them both on the same facts is not improper.[37]

Second, a finding of postmortem mutilation in this case does not implicate improper retroactivity. In *Byford,* this court noted that it had "never expressly decided whether postmortem mutilation" was an aggravating circumstance under NRS 200.033(8). We then explicitly held that it was, reasoning as follows. "Basing aggravating circumstances on the actions of the murderer following the victim's death is proper."[38] This court's earlier case law "tends to support the conclusion that the aggravating circumstance set forth in NRS 200.033(8) includes postmortem mutilation. More important, this conclusion is consistent with the statutory language."[39] This reasoning belies Hernandez's assertion that *Byford* pronounced a new, unexpected judicial expansion of NRS 200.033(8). "A judicial interpretation of a statute may be retroactively applied if it is both authoritative and foreseeable."[40] The holding in *Byford* was authoritative and foreseeable since it was consistent with prior case law and based on the language of the statute.

Finally, Hernandez argues that the aggravating circumstance of mutilation is unconstitutionally vague as set forth in NRS 200.033(8) and the jury instruction given in this case. This court upheld the constitutionality of this statute and this instruction in *Browne v. State.*[41] We decline to revisit the issue. Hernandez also contends that application of this aggravating circumstance to his case was unconstitutional because "the uterus has not previously been defined as an essential part of the body" and no evidence establishing it as such was presented. We consider this contention utterly without merit.

### 5. The evidence supporting premeditation and deliberation, burglary, kidnapping, and torture

Hernandez claims that there was insufficient evidence of premeditation and deliberation, burglary, kidnapping, and torture.

---

[36]*See id.*

[37]*Cf. Servin v. State,* 117 Nev. 775, 789-90, 32 P.3d 1277, 1287 (2001).

[38]*Byford,* 116 Nev. at 241, 994 P.2d at 717.

[39]*Id.*

[40]*Kreidel v. State,* 100 Nev. 220, 222, 678 P.2d 1157, 1158 (1984) (citing *Bouie v. City of Columbia,* 378 U.S. 347 (1964)), *overruled on other grounds by Nevada Dep't Prisons v. Bowen,* 103 Nev. 477, 745 P.2d 697 (1987); *see also Stevens v. Warden,* 114 Nev. 1217, 1221, 969 P.2d 945, 948 (1998).

[41]113 Nev. 305, 315-16, 933 P.2d 187, 193 (1997).

In reviewing the sufficiency of the evidence, this court must determine whether the jury, acting reasonably, could have been convinced by the competent evidence of the defendant's guilt beyond a reasonable doubt.[42] This court will not disturb a jury verdict where there is substantial evidence to support it, and circumstantial evidence alone may support a conviction.[43]

Hernandez contends that there was insufficient evidence of premeditation and deliberation. He says that there is no suggestion in the record that he brought a weapon to Donna's home, engaged in any planning of the offenses, or packed clothing in his car or otherwise prepared to leave town with his daughter. He notes that he parked his car in Donna's driveway without attempting to hide it and stresses that he was experiencing emotional turmoil and was heavily intoxicated.

We conclude, on the contrary, that there was strong evidence of premeditation and deliberation. The record shows that Hernandez repeatedly threatened to kill Donna. He left such threats on her answering machine. He made a veiled threat to kill her when he told Landeros "you're going to die, dogs." Later that evening, he made the threat explicit over the phone to Donna's mother. And about two weeks before the murder, he told a friend that he wanted to kill Donna. Further, the jury could reasonably have found that Hernandez acted premeditatedly and deliberately in murdering his ex-wife on October 6, the anniversary of their failed marriage. Hernandez's possession of over $1,000 in cash immediately after the murder could also reasonably be considered evidence that he planned the crime and his flight afterwards.

The evidence that Hernandez intended the murder also supports the jury's finding of burglary. If Hernandez entered Donna's house with the intent to murder her or to kidnap Ana, he committed burglary.[44] Hernandez emphasizes that he and Donna had been seen together on various occasions not long before her murder and that there was no sign that he forcibly entered her home. However, forcible entry is not an element of burglary; so even if Donna consented to his entry, he still committed a burglary as long as he entered with a felonious intent.[45]

---

[42]*Collman v. State,* 116 Nev. 687, 711, 7 P.3d 426, 441 (2000), *cert. denied,* 532 U.S. 978 (2001).

[43]*Id.*

[44]*See* NRS 205.060(1).

[45]*See id.; Barrett v. State,* 105 Nev. 361, 364, 775 P.2d 1276, 1277 (1989).

Hernandez contends that there was also insufficient evidence of second-degree kidnapping. As discussed above, he argues that he had legal custody of his daughter. He further argues that the divorce decree permitted him to take Ana out of state. These arguments are of no avail. To reiterate, NRS 200.310(2) provides in relevant part that "[a] person who willfully and without authority of law seizes . . . another person . . . for the purpose of conveying the person out of the state without authority of law, . . . is guilty of kidnapping in the second degree." Hernandez violated a protective order, a custody decree, and criminal statutes when he murdered Donna and took Ana. Therefore, he seized Ana without authority of law. And the evidence that his purpose was to convey her out of state to Mexico is overwhelming: he had threatened more than once to do so, he was driving with her in that direction when stopped by the police, and she told the police that was where her father was taking her.

Hernandez contends that there was insufficient evidence of murder by torture and of torture as an aggravating circumstance. "Torture involves a calculated intent to inflict pain for revenge, extortion, persuasion or for any sadistic purpose" and intent "to inflict pain beyond the killing itself."[46] In *Domingues v. State,* this court concluded that there was insufficient evidence of torture where the evidence did not indicate that the appellant's "intent was anything other than to kill" the victim and there was "no evidence that the specific intent behind the attempted electrocution or the stabbing was to inflict pain for pain's sake or for punishment or sadistic pleasure."[47]

Hernandez argues that the record here shows simply that he stabbed Donna to death and did not intend to torture her. We disagree. Coupled with the multiple injuries he inflicted on her before her death, Hernandez's act of thrusting the knife into Donna's vagina reflects an intent to inflict pain beyond the killing itself for a sadistic purpose. Hernandez counters that this act occurred after Donna's death and therefore cannot be torture; he cites *Byford v. State.*[48] Although the evidence was not conclusive that Donna was dead when the act occurred, we presume that she was because in the guilt phase the jurors found Hernandez guilty

---

[46]*Domingues v. State,* 112 Nev. 683, 702 & n.6, 917 P.2d 1364, 1377 & n.6 (1996).

[47]*Id.* at 702, 917 P.2d at 1377.

[48]116 Nev. at 241, 994 P.2d at 717 ("Although a victim who has died cannot be tortured, mutilation can occur after death.").

of sexual penetration of a dead body. Nevertheless, even if the knife was thrust into Donna's vagina after her death, it is relevant evidence of his state of mind before her death as he beat her, stabbed her repeatedly, and strangled her. We conclude that this evidence was sufficient to prove torture as an aggravator under NRS 200.033(8) and murder by torture under NRS 200.030(1)(a). There was also sufficient evidence of the "torture or mutilation" aggravator on the basis of the mutilation evident in the record.[49]

### 6. The page limit on appellant's opening brief

In June 2001, this court issued an opinion in this case denying Hernandez's motion for leave to file an opening brief of 124 pages and allowing him to file an eighty-page brief.[50] He contends that this violated his rights to meaningful appellate review and equal protection. He claims that he was forced to omit several issues, and he points out that this court has allowed opening briefs in excess of eighty pages in a number of other cases.

Hernandez's contention has no merit. In the past, this court has allowed longer briefs, but for the reasons set forth in our prior opinion in this case, we have decided to limit the length of briefs. This is not an arbitrary decision, and we are implementing it in a consistent manner. It is not just for the convenience of this court either: the interests of the appellant are best served when counsel focuses on key issues and omits weaker ones.[51] Here, Hernandez was allowed to file a brief fifty pages longer than the limit prescribed in NRAP 28(g). Moreover, the State points out that the font used in Hernandez's brief has approximately fourteen characters per inch, in violation of the limit of ten characters per inch required by NRAP 32(a). We flatly reject Hernandez's contention that the eighty-page limit on his brief forced him to omit issues which he should have included. A reasonable page limit does not prevent an appellant from presenting arguments, but merely limits the manner in which he can present them.[52]

### 7. Other claims

Hernandez contends that his right to a fair and impartial jury

---

[49]See id. at 240, 994 P.2d at 716 (stating that establishing either torture or mutilation is sufficient to support the aggravating circumstance set forth in NRS 200.033(8)).

[50]Hernandez v. State, 117 Nev. 463, 24 P.3d 767 (2001).

[51]See generally id.

[52]Id. at 467, 24 P.3d at 770 (citing Weeks v. Angelone, 176 F.3d 249, 271-72 (4th Cir. 1999), aff'd, 528 U.S. 225 (2000)).

was denied when the district court refused to dismiss a member of the venire for cause after he expressed some reluctance to consider all relevant mitigating evidence. Even assuming that the court should have excused the veniremember for cause, Hernandez was not prejudiced because the member did not serve on the jury.[53]

Hernandez complains that numerous bench and in-chamber conferences were conducted during the trial but not reported. He claims that this violated his right to meaningful appellate review. SCR 250(5)(a) generally requires proceedings in a capital case to be reported and transcribed. However, defense counsel did not object to holding these unreported conferences, and Hernandez fails to show that any plain error affecting his substantial rights occurred.

Hernandez contends that he should have been allowed to argue last in the penalty phase and that this court should overrule precedent to the contrary. This court has held that the State properly argues last in a capital penalty phase because NRS 175.141 mandates it and because the State has the burden of proving aggravators beyond a reasonable doubt.[54] Hernandez argues that the aggravators in his case were already proved in the guilt phase so he had the more significant burden in the penalty phase. We conclude that he has provided no justification for this court to disregard NRS 175.141.

Hernandez next argues that the aggravators of burglary and torture cannot be applied to his case because they were the basis for his murder conviction. He cites *State v. Middlebrooks* and *State v. Cherry,* opinions from Tennessee and North Carolina respectively.[55] Neither he nor the State cites *Atkins v. State,* where this court considered *Middlebrooks* and *Cherry* and rejected this argument, noting that the United States Supreme Court has implicitly approved the use of the underlying felony as an aggravator in felony-murder cases.[56]

Hernandez asserts that the death penalty is unconstitutionally cruel and unusual punishment. He also argues that Nevada's death penalty scheme is unconstitutional because it does not sufficiently

---

[53]It is not clear if Hernandez used a peremptory challenge to remove the member, but even if that was the case, Hernandez "has not demonstrated that any other jurors proved unacceptable and would have been excused had an additional peremptory challenge been available." *Thompson v. State,* 102 Nev. 348, 350, 721 P.2d 1290, 1291 (1986).

[54]*See Witter v. State,* 112 Nev. 908, 923, 921 P.2d 886, 896 (1996), *receded from on other grounds by Byford,* 116 Nev. 215, 994 P.2d 700.

[55]840 S.W.2d 317 (Tenn. 1992); 257 S.E.2d 551 (N.C. 1979).

[56]112 Nev. 1122, 1134, 923 P.2d 1119, 1127 (1996).

narrow the number of people eligible for the death penalty. He asserts that statistics from the U.S. Department of Justice show that Nevada has more persons on death row per capita than any other state in the country. He also claims that this court reverses an inordinately low number of death sentences. At trial defense counsel voiced a "general objection" to the constitutionality of the death penalty in Nevada. This was not sufficient to preserve the issues now raised on appeal, nor do we consider the claims to have merit.[57]

Hernandez argues that his conviction and sentence should be reversed due to cumulative error. The cumulative effect of errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually.[58] We conclude that any errors which occurred were minor and, even considered together, do not warrant reversal.

### 8. Mandatory statutory review of the death penalty

NRS 177.055(2) requires this court to review every death sentence and consider:

> (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
> (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
> (d) Whether the sentence of death is excessive, considering both the crime and the defendant.

Hernandez claims that his death sentence should be reversed under this statute. He invokes his earlier arguments challenging burglary, torture, and mutilation to suggest that the evidence did not support two pertinent aggravating circumstances. As discussed above, those arguments fail, and we conclude that the evidence supports all three aggravators. Claiming that his sentence was imposed under the influence of passion, prejudice, or an arbitrary factor, he again notes that two jurors purchased the victim's daughter a gift during the penalty phase. We do not agree that this shows that the jury acted under the influence of passion, prejudice, or any arbitrary factor, and we see no indication of such influence in the record.

In arguing that his death sentence is excessive, Hernandez claims that "[i]n nearly all other recent Nevada cases involving

---

[57]*See Gallego v. State,* 117 Nev. 348, 370, 23 P.3d 227, 242 (2001); *Leonard,* 117 Nev. at 82-83, 17 P.3d at 415-16.

[58]*Byford,* 116 Nev. at 241-42, 994 P.2d at 717.

the murder of a person by their spouse or ex-spouse, the death penalty has not been imposed.'' He then cites with little or no analysis six opinions by this court. This court has stated that ''our determinations regarding excessiveness of the death sentences of similarly situated defendants may serve as a frame of reference for determining the crucial issue in the excessiveness analysis: are the crime and defendant before us on appeal of the class or kind that warrants the imposition of death?''[59] Here, Hernandez provides no cogent argument demonstrating that the cases he cites involve ''similarly situated defendants.''

The jury recognized seven mitigating circumstances, but finding that the three aggravating circumstances outweighed them, imposed a death sentence. We perceive no basis to set aside this decision. Hernandez stalked his wife; murdered her without provocation in a horrific, savage manner; and did so in the presence of her, and his own, young daughter. We conclude that the death sentence is not excessive in this case.

## CONCLUSION

We affirm Hernandez's judgment of conviction and sentence of death.

---

[59]*Dennis v. State,* 116 Nev. 1075, 1085, 13 P.3d 434, 440 (2000).