139 Nev., Advance Opinion 20

IN THE COURT OF APPEALS OF THE STATE OF NEVADA

ANDREW YOUNG,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 83243-COA

FILED

JUL 20 2023

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of 12 counts of burglary; 4 counts of larceny from the person, victim 60 years of age or older; 3 counts of fraudulent use of a credit or debit card; and 1 count of grand larceny. Eighth Judicial District Court, Clark County; Jacqueline M. Bluth, Judge.

*Affirmed in part, reversed in part, and remanded.*

Yampolsky & Margolis and Jason R. Margolis, Las Vegas,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Parker P. Brooks and John Afshar, Deputy District Attorneys, Clark County,
for Respondent.

_____

BEFORE THE COURT OF APPEALS, GIBBONS, C.J., and BULLA and WESTBROOK, JJ.

23-23187

*OPINION*

By the Court, GIBBONS, C.J.:

During June, July, and August 2020, appellant Andrew Young and an accomplice carried out a series of thefts, generally against elderly victims, during which one of them would distract the victim while the other surreptitiously took the victim's wallet. After, Young purchased or attempted to purchase items from stores using the credit and debit cards from the wallets taken from his victims. Young was eventually identified by the Las Vegas Metropolitan Police Department (LVMPD) and convicted of 20 various counts of burglary, larceny, and fraudulent use of a credit or debit card (cards).

On appeal from the judgment of conviction, Young raises numerous issues, the vast majority of which were unpreserved as a result of counsel's failure to contemporaneously object at trial. This opinion illustrates the importance of making timely objections to preserve the record in order to facilitate appellate review. While most of Young's arguments are resolved under existing law, this opinion addresses in particular Young's argument that the district court erred in denying his motion for mistrial or, alternatively, in declining to excuse a juror based on the seated juror's expression of sympathy for victims who testified during trial. In discussing the issue surrounding this juror, this opinion distinguishes the different types of juror bias, offering guidance on how to navigate such a claim if it arises during trial. We also provide additional clarity concerning jury instructions related to larceny-from-the-person charges to ensure that jurors are properly instructed on all elements of that crime, as stated in the Nevada 2023 Pattern Jury Instructions: Criminal.

 

## FACTS AND PROCEDURAL HISTORY

*Counts 1-5 (two counts of burglary; larceny from the person, victim 60 years of age or older; grand larceny; and fraudulent use of a card)*

Young and his accomplice approached Mary Campo, age 72, while she was sitting at a gaming machine inside the Rampart casino. One of the men showed Campo a piece of paper while asking her questions. As Campo answered the man's questions, the other man stood behind her. When the two men left, Campo reached into her purse and discovered her wallet was missing. Although it is unclear from the record exactly where her purse was situated while she was at the gaming machine, it was not on her person. Her wallet contained her cards and approximately $1400. Campo's bank contacted her that same night and reported that her card had been used at a 7-Eleven convenience store in Las Vegas.

Detective Grimes of LVMPD retrieved surveillance video from the casino, video footage from the 7-Eleven, and a receipt from Young's card transactions at the 7-Eleven. At trial, while testifying and narrating footage depicting the theft involving Campo, Grimes stated that when the two men approached Campo, one of them used his jacket to conceal Campo's view of his arm and he grabbed something from very close to Campo and then hid it under his jacket.

Detective Grimes later became aware of a separate theft of an elderly woman's wallet involving two male suspects at the nearby Suncoast Hotel and Casino.[1] When Grimes saw the video from this later incident, he "immediately recognize[d] it's the same two males from the" Campo incident. Grimes testified that one of the two men wore the same shoes

---

[1]The separate wallet theft referenced here is included in the State's indictment as count 22.

during both incidents. Grimes spoke with Detective Janecek, who was investigating the Suncoast wallet theft, after LVMPD's facial recognition section identified one of the suspects in police body camera footage as Young based on his white shoes bearing a distinctive black stripe.[2]

*Count 6 (burglary)*

Young also participated in stealing Lydia Hefner's wallet inside a Walmart. As Hefner, age 68, finished shopping and headed toward the checkout stand, a Walmart employee, Vianca Eskildsen, ran towards Hefner and asked if Hefner had her wallet in her purse. Hefner looked inside her purse and discovered her wallet was missing. Eskildsen had been observing Young walking through the store and using his jacket to conceal his arm while he hovered over customers. As her suspicion about Young grew, Eskildsen called LVMPD. Once police officers responded to the call and arrived at the Walmart, they entered the Walmart security office and watched the live surveillance footage of Young. At trial, Eskildsen testified that the video showed Young taking Hefner's wallet out of her purse.

Officer Wheeler was one of the officers who accompanied Eskildsen to the security office and observed Young stealing on live surveillance. Wheeler testified that Walmart security showed him "footage of a male that they've had problems with before, [and] that they're concerned about him trying to steal." The officers took Young into custody, searched him, and recovered a wallet belonging to Hefner. Young told the officers he found the wallet on the floor, but Wheeler testified he witnessed Young live by surveillance camera taking the wallet from Hefner's purse.

---

[2]The police body camera footage referenced here, related to count 6, was recorded and obtained from Young's interaction with Officer Wheeler during a wallet theft at Walmart.

*Counts 7-8 (burglary and larceny from the person, victim 60 years of age or older)*

Rhonda Hatcher, age 63, was carrying her purse while riding in the Caesars casino elevator with her mother. Hatcher testified that there were two men also in the elevator and that one of the men claimed he was blind and asked if he had pushed the correct button. After exiting the elevator, Hatcher felt something was wrong, so she looked in her purse. She discovered her wallet was gone and immediately filed reports with security and LVMPD. While filling out the security report, Hatcher received notifications from her bank asking if she authorized certain transactions using her cards. Hatcher never authorized anyone to possess or use her cards.

Detective Jacobitz reviewed substantial video surveillance from this theft and other theft and fraud incidents that occurred over the summer. He identified Young in the casino elevator video played during his testimony at trial. During his testimony, Jacobitz commented that he felt Young was "smooth" and that Young had "been doing this for a long time. He's good." However, Jacobitz immediately admitted he had no information as to how long Young had been "doing this" and that these comments reflected his opinion. Young did not object, nor did he move to strike this portion of Jacobitz's testimony. Jacobitz also stated that he believed the two men in the elevator were a team because they were not using the elevator to go to a hotel room and the two men left the casino after returning to the ground floor. Over objection, Jacobitz also testified he learned that Young was not registered at the hotel.

*Counts 9-10 (burglary and larceny from the person, victim 60 years of age or older)*

Joanne Frank, age 77, was approached in an Albertsons supermarket by two men, one of whom was later identified as Young. One of the men began asking her questions. She spoke with the man for about 15 minutes. As soon as the two men left, she noticed that her backpack purse, which she was wearing at the time, had been opened. She left the store without purchasing anything and discovered her wallet was missing from her backpack purse but stated she "didn't feel a thing" during her encounter with the two men. Her bank contacted her to report her card was used to attempt to make a purchase, but the transaction was declined.

*Counts 11-14 (burglary and fraudulent use of cards)*

Barbara Bowen, age 80, was approached by a man while shopping at Walmart with her daughter. Bowen was securing an item from the shelf when the man told her he wanted the same item, and Bowen handed him one. The man thanked her and left. Bowen had her purse sitting in the bottom portion of her shopping cart. When she tried to pay for an item, she realized her wallet was missing, and after confirming the wallet was not in her car, Bowen reported the wallet missing to Walmart security. Bowen's cards were used to make two unauthorized purchases at a Walmart and a GameStop store, and another attempted transaction, at a Walgreens, was declined.

An employee at GameStop testified that Young entered the store and made purchases with a card that was later determined to be Bowen's. On a later date, Young made a purchase at the GameStop with a card belonging to Montho Boone. During both visits, Young is seen on video

wearing similar clothing. Young purchased a Vanilla Visa prepaid gift card[3] during both visits to the GameStop.

An employee at Walgreens also testified that Young visited the store and attempted to purchase a Vanilla Visa card and cigarettes. Young was not able to complete any transactions at Walgreens after the cards he used were declined multiple times. The same Walgreens employee testified that on another occasion a man with similar clothing visited the store and attempted to purchase a Vanilla Visa card.

*Counts 15-16 (burglary and larceny from the person, victim 60 years of age or older)*

Young was also involved in an incident at the Flamingo casino with Serry Mello, age 69, who, with his spouse, was inside the elevator heading to their room. Young and another man entered the casino elevator with Mello and his spouse. Fifteen minutes after Mello arrived at his hotel room, he received a phone call from his bank reporting suspicious activity on his card. Mello discovered he did not have his wallet, which had been in the front pocket of his pants, and reported that he had not authorized the suspicious transactions.

Detective Cipriano investigated the incident and obtained surveillance footage taken in the hotel elevator. After working with other detectives and reviewing other video evidence during his investigation, Cipriano identified Young as one of the men in the elevator.

---

[3]A Vanilla Visa card is a basic credit card that allows a purchaser to add a pre-paid balance, subject to a limit, to the card. These cards can be used for payment at any store that accepts Visa cards.

*Counts 17-20 (burglary and fraudulent use of cards)*

Montho Boone, age 81, testified that she visited Walmart with her daughter and had her wallet inside her purse. She stated her purse had been zipped closed and was sitting in the upper portion of her shopping cart, tied to the cart using the cart's belt. Boone was browsing in the produce section and turned away from her cart for a short time. When she turned back, her purse was unzipped, and her wallet was gone. Boone and her daughter reported the wallet missing to Walmart security. Boone's bank notified her that her cards were used to make several transactions at GameStop and Walgreens, though some were declined.

Detective Liske investigated and visited the GameStop and Walgreens where Young apparently used Boone's cards. He obtained video from the two businesses. Liske's partner was investigating the incident involving Bowen, so the two compared video footage from their investigations. In comparing the videos, Liske observed that the suspect was an "older Black male adult . . . wearing the same exact clothing in all the instances."

*Count 21 (burglary)*

Tina Leigh, age 60, visited Walmart with her purse strapped into her shopping cart. She testified that she encountered a tall man in one of the aisles who asked her "a ridiculous question about" mixing two cleaning supplies. She responded and turned away. As she turned away, she saw another man stick his hand in her purse and take something. She checked her purse and discovered her wallet was gone. She stated the man who reached into her purse had a jacket draped over his arm. Leigh testified that she felt the two men were working as a team because the taller man left as soon as she saw the other man reach into her purse. Leigh

learned from her bank that someone tried to use her cards within an hour of the theft, but the transactions were stopped after Leigh reported her cards were stolen.

Detective Liske testified that video surveillance showed one man distracting Leigh while the other reached into her purse and took her wallet. He also testified that in the three theft investigations in which he reviewed video footage (the thefts involving Boone, Bowen, and Leigh), it appeared one suspect wore the same t-shirt and white shoes with a black stripe and always had a jacket draped over his left arm. Liske testified that this Walmart theft became significant because Young was identified at Walmart when confronted and recorded on body camera and given a citation by Officer Wheeler outside the store. Liske testified that Young wore the same shoes during all three theft incidents he investigated. Finally, Liske testified that Young also wore the same shoes when Young was finally arrested, and police impounded the shoes as evidence.

*Count 22 (burglary)*

Barbara Angersbach testified regarding an incident at a casino that involved Young and another man approaching her at the gaming machines. Angersbach, age 83, had her purse next to her as she was playing one of the slot machines. Her purse was open when Young and the other man approached her. She told the two men they needed to be six feet away from her because of COVID restrictions. Angersbach testified she did not see either man put any money into any machines to play. The two men left after agreeing they could not be so close to Angersbach. When she reached into her purse to find her glasses, she noticed her wallet missing. On her way home, her bank contacted her about suspicious activity with her cards. She filed a police report the next day.

Detective Grimes reviewed the video surveillance footage and recognized the two men as the same pair of suspects from the Campo incident. The shorter man was wearing the same shoes during both incidents. Grimes submitted photographs to the LVMPD facial recognition section and eventually learned that an identification was made using body camera footage from Young's encounter with Officer Wheeler outside of Walmart. Grimes testified that in both casino incidents, as well as in the Albertsons' incident, one of the suspects wore the same shoes and shorts and was recognizable because of his bald head and limp or unusual gait.

Detective Byrd from the facial recognition section testified that he reviewed different incidents, including the Walmart incident involving Hefner and Officer Wheeler when Young was given a citation. He also examined video surveillance footage related to the thefts that occurred inside elevators. During his trial testimony, Byrd identified the suspect in all the videos as Young and identified him inside the courtroom. He stated that he was able to identify Young because Young had a "shiny bald head." wore "white-colored headphones with some black accents," carried a "black jacket," had "glasses clipped to the front of his shirt," had "very distinct eyes," and wore the same "white and black shoes." The headphones, black jacket, and shoes were distinct features that, according to Byrd, appeared in almost every surveillance video he viewed when trying to identify the suspect. Young also had walked with a distinct dip that was like a limp or some kind of awkward sideways movement. Byrd identified Young as the individual depicted in six videos showing either a theft-related offense or fraudulent use of a credit or debit card.

The State's second superseding indictment charged Young with the following 22 counts: counts 1, 4, 6, 7, 9, 11, 13, 15, 17, 19, 21, and 22

(burglary); counts 2, 8, 10, and 16 (larceny from the person, victim 60 years of age or older); count 3 (grand larceny); and counts 5, 12, 14, 18, and 20 (fraudulent use of a credit or debit card).

Following the jury trial, Young was found guilty on all counts except counts 14 and 20, which involved the alleged fraudulent use of cards at Walgreens. He was sentenced under NRS 207.010(1)(b), Nevada's large habitual criminal statute, for counts 1, 6, 7, 9, 11, 15, 17, 21, and 22. The district court sentenced Young to serve concurrent and consecutive prison terms totaling 90 years to life in the aggregate. Young now appeals.

## ANALYSIS

We first address Young's arguments related to the trial proceedings that the district court improperly admitted evidence of prior bad acts, improperly allowed testifying police officers to narrate and describe the thefts while surveillance video footage was played for the jury, and allowed for inadmissible hearsay evidence to be presented to the jury. We then turn to Young's arguments that the district court erred in denying Young's motion for mistrial based on a juror's showing of sympathy for Young's victims and that the district court improperly allowed counsel to argue in the presence of that juror. Next, we address Young's arguments that the district court gave erroneous jury instructions and that there was insufficient evidence to support the jury's verdict. Finally, we address Young's sentencing arguments.

*The district court did not improperly admit evidence of uncharged bad acts*

Young argues that the district court erroneously admitted prior bad act evidence but concedes he did not raise this issue before or during trial. Young specifically argues that certain testimony by LVMPD officers gave rise to the inference that he committed prior, unspecified bad acts. The testimony Young highlights includes (1) Officer Wheeler testifying that he

responded to the call from Walmart because Walmart employees reported a "male that they've had problems with before" and they were "concerned about him trying to steal"; (2) Detective Jacobitz identifying Young based on his review of substantial video surveillance and testifying that Young was "smooth," "good," and "[h]e's been doing this for a long time"; (3) Detective Cipriano's testimony that he identified Young by watching a lot of video surveillance footage; and (4) Detective Grimes' testimony that he identified Young after performing a records check on his name and date of birth and finding a match in the LVMPD system. Young argues these statements by LVMPD officers constituted "*de facto* bad act evidence" that required a pretrial hearing regarding admissibility because the officers' testimonies allowed jurors to speculate that Young was dangerous or had a criminal character, thus making it seem more likely that he committed the charged crimes. The State responds that the issue is waived because Young did not object below and that it did not offer bad act evidence, so a pretrial hearing was unnecessary.

This court will consider and correct an unpreserved error only when an appellant demonstrates "that: (1) there was an 'error'; (2) the error is 'plain,' meaning that it is clear under current law from a casual inspection of the record; and (3) the error affected the defendant's substantial rights." *Jeremias v. State*, 134 Nev. 46, 50, 412 P.3d 43, 48 (2018) (citing *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003)). "[A] plain error affects a defendant's substantial rights when it causes actual prejudice or a miscarriage of justice (defined as a 'grossly unfair' outcome)." *Id.* at 51, 412 P.3d at 49. The appellant holds the burden of showing that his substantial rights were affected and that he was actually prejudiced. *See Phenix v.*

*State*, 114 Nev. 116, 119, 954 P.2d 739, 740 (1998). However, review of forfeited errors is discretionary. *Jeremias*, 134 Nev. at 52, 412 P.3d at 49.

We conclude Young has not demonstrated that the statements he identifies as de facto bad act evidence are clearly bad act evidence from a casual inspection of the record. None of those statements clearly constituted "[e]vidence of other crimes, wrongs or acts" to prove Young's character or show that he acted in conformity therewith. *See* NRS 48.045(2). Young argues that the statements "gave rise to the inference" that he committed prior bad acts. Although the officers' statements may have referenced past crimes that Young committed, and could possibly have been admitted in error, because there was no objection, it cannot be determined if the statements were referring merely to Young's criminal conduct during the summer months of 2020 or other crimes or bad acts. That criminal conduct from 2020 was directly at issue during Young's trial and the basis of the State's charges against Young and would not be evidence of uncharged crimes. Further, even with an inference of past wrongdoing by Young, he fails to demonstrate that any error caused by the officers' statements affected his substantial rights, especially in light of the significant evidence establishing Young's guilt—his identification and pattern and manner of distract thefts during the summer of 2020.

To the extent Young takes issue with the lack of a pretrial hearing and Detectives Jacobitz, Cipriano, and Grimes testifying that they reviewed surveillance video from theft crimes that occurred over the summer months of 2020 before identifying Young as a suspect, this testimony was relevant to explain their involvement in this case and why they took the actions they did during their investigations. Further, the evidence was not unfairly prejudicial because it related to other charges in

the case, all of which occurred during the summer of 2020, and was not clearly prior bad act evidence. *Cf. McNelton v. State*, 115 Nev. 396, 405, 990 P.2d 1263, 1269 (1999) (holding that a district court's failure to conduct a hearing regarding the admissibility of prior bad acts does not require reversal of an appellant's convictions if "(1) the record is sufficient to determine that the evidence is admissible under *Tinch*; or (2) the result would have been the same if the trial court had not admitted the evidence"); *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997) ("To be deemed an admissible bad act, the trial court must determine, outside the presence of the jury, that: (1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."), *holding modified by Bigpond v. State*, 128 Nev. 108, 270 P.3d 1244 (2012).

As for the statements by Officer Wheeler and Detective Jacobitz, we conclude that their testimonies were isolated, nonspecific, and did not affect Young's substantial rights. Walmart security having "problems" with Young and worrying he was "trying to steal" and Jacobitz believing that Young had "been doing this for a long time," though possibly referencing Young's past criminal behavior and experience as a thief using a distraction technique, could just as easily have been referring to Young's contemporaneous conduct or other charged criminal conduct occurring during the summer of 2020, but absent an objection, the record was not developed and we cannot determine the context with accuracy. Thus, under a casual inspection of the record, and when considering Young's substantial rights in light of the overwhelming evidence of guilt, we decline to conclude that the district court plainly erred. Further, the district court did not

improperly fail to conduct a pretrial hearing on the admissibility of the officers' statements because the State did not seek to offer bad act evidence, and what was elicited was not intentionally caused to be revealed by the State at trial. Nevertheless, it is concerning that multiple questionable statements were made, and we caution the State to better prepare and control its witnesses to ensure a fair trial.

Young additionally argues that the district court should have offered a limiting instruction regarding the jury's consideration of the alleged bad act evidence. Young argues that the State should have requested the instruction and that the district court was required to instruct the jury before the admission of bad act evidence. The State responds that any comment during the officers' testimonies was not so inherently prejudicial that it required the district court to act sua sponte to preclude testimony.

The failure of a district court to proffer a limiting instruction is reviewed for nonconstitutional error under NRS 178.598. *Mclellan v. State*, 124 Nev. 263, 269, 182 P.3d 106, 111 (2008). The test set forth in NRS 178.598 mirrors the test used by federal courts as set forth in *Kotteakos v. United States*, 328 U.S. 750, 776 (1946), which asks "whether the error had substantial and injurious effect or influence in determining the jury's verdict." *Mclellan*, 124 Nev. at 269-70, 182 P.3d at 111 (quotation marks omitted). If the appellant suffered no prejudice as determined under this test, then the conviction stands. *Id.* at 270, 182 P.3d at 111. Here, any actual error would be deemed harmless in light of the brief and equivocal nature of the alleged improper evidence and the overwhelming evidence of Young's guilt. Therefore, we conclude that Young fails to establish reversible error.

*The district court did not plainly err in allowing officers to narrate during testimony about the content of the surveillance footage*

Young argues that the district court erred when it allowed LVMPD officers to narrate the events and identify Young in surveillance video played by the State because the officers did not have independent knowledge of Young aside from their review of video during their respective investigations. Young did not object at any time below, so we again review for plain error. *See Jeremias*, 134 Nev. at 50, 412 P.3d at 48.

Both parties cite *Burnside v. State*, 131 Nev. 371, 352 P.3d 627 (2015) to support their contentions about whether the officers' testimonies were permissible narrations and identifications of Young. *Burnside* requires that a testifying officer "have some prior knowledge or familiarity with" the individual or the defendant they identify in video surveillance. *Id.* at 388, 352 P.3d at 639. However, when an officer's testimony describing surveillance footage is founded upon the use of independent evidence to confirm the identity of the person in the video, there is no invasion upon the province of the jury. *See id.*

The LVMPD officers who testified had sufficient prior independent knowledge through their review of video and photographs from their investigations, or from personal interaction with Young, to allow them to identify Young. Additionally, Officer Wheeler identified Young before any other LVMPD officer identified Young; therefore, the officers who identified Young after Wheeler also relied upon Wheeler's identification. Wheeler had sufficient prior knowledge of Young's appearance because Wheeler observed Young in Walmart by a live surveillance camera and interacted with Young in person outside of Walmart before issuing him a citation for petty theft. Therefore, Young fails to show plain error regarding the officers' identification of Young.

As to the issue of narrating during the State's presentation of video evidence, we again conclude that Young fails to demonstrate plain error. *See id.* at 388-89, 352 P.3d at 640 (holding that narration of surveillance video assisted jurors in understanding the evidence, given the complexities of the surveillance cameras and the piecing together of videos from hours of recordings). The videos presented during trial were comprised of footage from numerous days, times, and locations. The State presented video surveillance from inside different stores, elevators, and casinos. The surveillance also fluctuated in terms of quality and clarity. Given the complexity and variations of the videos, the district court could have reasonably concluded that the officers' narration was necessary to assist jurors in understanding what was occurring. *See id.* at 388, 352 P.3d at 639 (noting that narration of surveillance videos is proper when it "assist[s] the jury in making sense of the images depicted in the videos"). The narration was also highly relevant, given how Young and his accomplice carried out their thefts. Young's thefts involved distraction, which may not have been visible or apparent to jurors without the officers' narration. Therefore, we conclude that Young has not shown error, plain or otherwise.

*The district court's admission of Detective Jacobitz's statement was not reversible error*

Young argues that Detective Jacobitz's statement that Young and his partner were not registered guests of the hotel where they stole Hatcher's wallet constituted inadmissible hearsay because Jacobitz learned this information from an outside source, most likely a hotel employee. The State argues it was nonhearsay offered to show the effect on Jacobitz and his investigation rather than to prove the truth of the matter asserted. Although Young initially objected on hearsay grounds when Detective

Jacobitz testified, "I later come to find that they're not registered to the hotel," he failed to renew his objection or move to strike the testimony after the district court allowed the State to lay a foundation for the information elicited from Jacobitz's testimony.

The admission of evidence is reviewed for an abuse of discretion. *Mclellan*, 124 Nev. at 267, 182 P.3d at 109. The rule precluding the admission of hearsay does not apply to statements offered only to show that the statement was made and that the listener was affected by the statement. *See* NRS 51.035; *Wallach v. State*, 106 Nev. 470, 473, 796 P.2d 224, 227 (1990) (holding that a detective should have been allowed to testify about a victim's statement "that the assailant 'tore off her clothes'" to explain why the detective examined the clothes). On one hand, the statement that Young was not a registered hotel guest could arguably have been offered for the truth of the matter asserted. Young was in a hotel elevator heading toward guest sleeping rooms. If he were not a guest, the inference is significant in suggesting he may have been there for nefarious purposes. However, Jacobitz's testimony also explained why he opined that the surveillance footage from the elevator showed that Young was working in conjunction with the other man in the elevator to steal Hatcher's wallet. Where Young failed to renew his objection to the testimony after the district court permitted the State to lay a foundation for it, we cannot determine in the first instance whether it was offered for the truth of the matter asserted, if it was nonhearsay or a hearsay exception may have applied. And we cannot say the district court plainly erred in admitting it.

But even if the district court abused its discretion in admitting Jacobitz's statement, any error would have been harmless because it was a minor piece of information related to the charged crime of theft of Hatcher's

wallet. Further, the evidence against Young for this offense and as a whole was overwhelming, where Young and his accomplice were in the elevator with Hatcher and distracted her, and her wallet was missing from her purse after she exited. *See Tabish v. State*, 119 Nev. 293, 311, 72 P.3d 584, 595 (2003) ("Harmless error analysis applies to hearsay errors.").

*The district court did not abuse its discretion in denying Young's motion for a mistrial and in not excusing a juror for his display of sympathy to victims*

During the third day of trial, a seated juror, no. 11, wrote a note for the district court asking "[w]ould you mind if I give each of the victims $2,000 in an envelope after they are excused?" The note was addressed during a recess, outside of the presence of the jury, and juror no. 11 was asked to stay inside the courtroom. Juror no. 11 was then canvassed by the court and by Young. The court explained the importance of not forming opinions until the end of the trial and the duty to remain fair and impartial. Juror no. 11 assured the court that his note was only motivated by his desire to help the elderly victims who lost money. He stated that his offer to donate money had nothing to do with Young as a defendant and he would remain fair and impartial and not form opinions until the end of the case. He further explained that he helps victims all the time and he gave the note to the court during trial and not at the conclusion of trial because he did not think he would have an opportunity to contact the victims or obtain their contact information after the trial concluded. Young moved for a mistrial following juror no. 11's exit from the courtroom, which was denied, and the district court did not remove juror no. 11 from the jury.

Young argues that the district court should have granted his motion for a mistrial or at least excused juror no. 11 for bias after the juror wrote the note to the court. Young further argues that the juror's conduct undermined his impartiality and constituted inferable bias, and that the

district court's decision to allow the juror to remain on the jury panel amounted to reversible error. We conclude that the district court did not abuse its discretion in denying the motion for a mistrial and in not removing juror no. 11. Juror no. 11's statement did not establish inferable bias, as Young argues. Instead, the statement suggested actual bias, so the district court undertook efforts to rehabilitate juror no. 11 and found him to be impartial, and Young does not directly challenge the district court's rehabilitation efforts on appeal.

The denial of a motion for a mistrial is reviewed for abuse of discretion. *Randolph v. State*, 117 Nev. 970, 984, 36 P.3d 424, 433 (2001) (citing *Smith v. State*, 110 Nev. 1094, 1102-03, 881 P.2d 649, 654 (1994)). Likewise, the decision to retain or remove a juror is reviewed for abuse of discretion. *See Blake v. State*, 121 Nev. 779, 795-96, 121 P.3d 567, 578 (2005) (reviewing a for-cause challenge against a prospective juror for an abuse of discretion); *see also Nelson v. Commonwealth*, 589 S.E.2d 23, 30-31 (Va. Ct. App. 2003) (applying the abuse of discretion standard to decisions regarding challenges for cause to both seated jurors and venirepersons).

Whether a juror is biased is determined by the district court acting within its discretion. *Sayedzada v. State*, 134 Nev. 283, 291, 419 P.3d 184, 192 (Ct. App. 2018). Traditionally, juror bias was either actual or implied. *See United States v. Wood*, 299 U.S. 123, 133 (1936). Actual bias, or bias in fact, is the existence of "a state of mind that prevents the juror from being impartial." *Sayedzada*, 134 Nev. at 289, 419 P.3d at 191 (citing *United States v. Torres*, 128 F.3d 38, 43-44 (2d Cir. 1997)). A court generally finds actual bias based upon the juror's voir dire answers. *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion). For instance, if

a juror admits to partiality and cannot unequivocally say they would be impartial, that juror should be removed for actual bias. *See Preciado v. State*, 130 Nev. 40, 44, 318 P.3d 176, 179 (2014) ("Prospective juror # 304's statement that a graphic photo would make her believe the defendant was guilty (without proof that the defendant caused the [injury] depicted in the photo) cast doubt on her impartiality" and required her removal for cause.).

By contrast, implied bias, or presumed bias, is "bias conclusively presumed as matter of law," generally due to the juror's prior knowledge or relationship to the case or parties. *Wood*, 299 U.S. at 133. At common law, implied bias could be found in situations where the juror was "related to or [had] worked with a party, or [had] some interest in the outcome of the case." *Sayedzada*, 134 Nev. at 290, 419 P.3d at 191-92. Although the Nevada Legislature "codified elements of the common law's implied bias in the civil context" within NRS 16.050,[4] it has not explicitly done so in the criminal context. *Id.* at 290, 419 P.3d at 192; *see* NRS 175.021(1) ("Trial juries for criminal actions are formed in the same manner as trial juries in civil actions.").

---

[4]NRS 16.050(1) states that challenges for cause may be taken on one or more of the following grounds, amongst others: a want of any of the qualifications prescribed by statute to render a person competent as a juror; consanguinity or affinity within the third degree; standing, being a member of the family of either party or a partner, or united in business with either party; having served as a juror or been a witness on a previous trial between the same parties for the same cause of action or being then a witness therein; interest on the part of the juror in the event of the action, or in the main question involved in the action; having formed or expressed an unqualified opinion or belief as to the merits of the action, or the main question involved therein; the existence of a state of mind in the juror evincing enmity against or bias to either party.

A third type of bias, inferable bias, is determined when a judge exercises "discretion to infer bias from the facts elicited during voir dire where those facts show an average person in the juror's situation would be unable to decide the matter objectively." *Id.* at 291, 419 P.3d at 192. Importantly, inferable bias has only been found in limited circumstances, namely where the juror has engaged in activities similar to those activities at issue in the case being tried such that a reasonable person in the juror's position could not compartmentalize their past experiences to objectively judge the case. *Id.* This can occur, for example, when the juror was a victim of the same type of crime charged against the defendant. *See, e.g., id.* at 292, 419 P.3d at 193 (stating that bias could be inferred where prospective juror was the victim of the same type of crime charged and stated that these experiences made her "angry" and that she "could be biased" against the defendant); *Torres*, 128 F.3d at 48 (stating that bias could be inferred where prospective juror admittedly engaged in the structuring of cash deposits, which was similar to the conduct for which the defendant was on trial).

If a juror's statements establish implied or inferable bias, it does not matter whether that juror subsequently expresses impartiality; that juror *must* be removed. *Sayedzada*, 134 Nev. at 291, 419 P.3d at 192 ("[O]nce facts are elicited that permit a finding of inferable bias, then, just as in the situation of implied bias, the juror's statements as to his or her ability to be impartial become irrelevant." (quotation marks omitted)). By contrast, if a juror's statements suggest actual bias, the juror can still serve if the district court, after canvassing the juror, determines that they "will be impartial despite the bias." *Sanders v. Sears-Page*, 131 Nev. 500, 507, 354 P.3d 201, 206 (Ct. App. 2015); *accord Sayedzada*, 134 Nev. at 290, 419

P.3d at 191. Therefore, our resolution of this issue turns on whether juror no. 11's statements demonstrated inferable bias or actual bias.

Contrary to Young's argument, juror no. 11's short one-sentence question asking if he could make a cash donation to the victims after they were excused did not establish inferable bias, which therefore could not be rehabilitated. After the district court was notified of the juror's request, the district court and the parties questioned the juror regarding that issue. Juror no. 11 expressed sympathy for the victims, explained that he had the financial means to help them, and he had made similar philanthropic gifts in the past. Juror no. 11 gave no indication that he had been a victim of similar crimes or otherwise shared life experiences with the victims that would have made it impossible or difficult for him to judge this case fairly. The court's discussion and questioning with juror no. 11 demonstrated that he did not have an implied or inferable bias.

Nevertheless, while we conclude that juror no. 11's statement did not establish an implied or inferable bias, his note and explanation to the district court *did* suggest actual bias because it was an expression of sympathy for the victims. Numerous state and federal courts have addressed the issue of juror sympathy under an actual bias standard. *See Skilling v. United States*, 561 U.S. 358, 398-99 (2010); *Miller v. Webb*, 385 F.3d 666, 673-75 (6th Cir. 2004); *Ainsworth v. Calderon*, 138 F.3d 787, 796 (9th Cir. 1998); *Williams v. State*, 67 S.W.3d 548, 561 (Ark. 2002); *People v. Harris*, 247 A.D.2d 630, 631 (N.Y. App. Div. 1998); *Boone v. State*, 60 S.W.3d 231, 237 (Tex. App. 2001).

When a juror expresses actual bias, that juror may remain on the jury if they affirm that they can set aside the source of bias to judge the case solely on the evidence. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961) ("It is

COURT OF APPEALS
OF
NEVADA

(O) 1947B

23

sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."). As this court explained in *Sanders*, "[i]f a juror's statements suggest actual bias, the trial court must properly question the juror to determine if the juror will be impartial despite the bias." 131 Nev. at 507, 354 P.3d at 206 (citing *Thompson v. Altheimer & Gray*, 248 F.3d 621, 627 (7th Cir. 2001)). A juror's statements of impartiality are not talismanic and must be considered together with the totality of the facts involved. *Sayedzada*, 134 Nev. at 289, 419 P.3d at 191 (citing *Weber v. State*, 121 Nev. 554, 581, 119 P.3d 107, 125 (2005), *overruled on other grounds by Farmer v. State*, 133 Nev. 693, 698, 405 P.3d 114, 120 (2017)). A juror is successfully rehabilitated when they can "state without reservation that [the juror] had relinquished views previously expressed which were at odds with their duty as impartial jurors." *Weber*, 121 Nev. at 581, 119 P.3d at 125.

As long as the district court "*sufficiently* questions the juror and determines the juror can set aside any bias and be impartial, we will generally defer to the trial court's decision." *Sanders*, 131 Nev. at 508, 354 P.3d at 206. Again, the district court has "broad discretion" to determine whether a juror's answers demonstrate actual bias, *Sayedzada*, 134 Nev. at 290, 419 P.3d at 191, and is in the best position to evaluate juror demeanor and credibility, *Patton v. Yount*, 467 U.S. 1025, 1038 n.14 (1984) ("Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying.").

Here, the district court questioned juror no. 11 outside the presence of the rest of the jury after he gave the note to the court asking if he could give money to the victims. In response, the district court stated

that it had no control over the activities of jurors after the case was over and it could not prohibit gifts to the alleged victims at that time. Nevertheless, the court reminded juror no. 11 that the jury had been admonished throughout the trial not to form or express any opinions until the matter was finally submitted to it for a decision. The district court stated it needed to ensure that juror no. 11 could remain fair and impartial to both sides and that he must wait until the end of the trial to form a final opinion after deliberating with all the jurors.

Juror no. 11 affirmed twice that he could remain fair and impartial for the remainder of the trial. He explained that his desire to help had nothing to do with the case or the defendant but came from being the type of person that likes to regularly help others. The district court specifically asked him if he had discussed this issue with other jurors, and juror no. 11 responded that he had only mentioned it to the marshal. Upon questioning by defense counsel, juror no. 11 was steadfast that he would be fair and impartial. The district court concluded that removing juror no. 11 was not required because he had not engaged in misconduct or provided any gifts, and he stated that he would be fair and impartial.[5]

---

[5]We recognize that the district court cited to *Hernandez v. State*, 118 Nev. 513, 50 P.3d 1100 (2002), in its efforts to address juror no. 11's sympathy for the elderly victims. On appeal, the State also relies on *Hernandez*, and Young did not address the issues related to juror no. 11 in his reply brief. Despite the factual similarities between this case and *Hernandez*, *Hernandez* is not controlling. In *Hernandez*, the Nevada Supreme Court held that reversal was not required where a motion for a mistrial was denied when certain jurors purchased a gift for the murder victim's daughter following the guilt phase of the trial but before the penalty phase and kept the gift in the jury room during the penalty phase deliberations. *Id.* at 521-22, 50 P.3d at 1106-07. The supreme court held that the jurors' discussion about the gift was not misconduct, but even if it

We conclude that the district court did not abuse its discretion when it found that juror no. 11 would be fair and impartial and had not discussed the idea of a gift with other jurors. *See United States v. Tsarnaev*, 595 U.S. ___, ___, 142 S. Ct. 1024, 1036 (2022) (holding that a federal court of appeals cannot extend its supervisory powers to overturn a federal district court's broad discretion to manage jury selection and to decide what questions to ask prospective jurors absent an abuse of discretion by the district court).

While the facts of this case support an argument that juror no. 11 exhibited actual bias, and many judges would have excused the juror and replaced him with an alternate juror, Young failed to raise an argument under an actual bias theory to this court. Young also did not challenge the sufficiency of the district court's canvass of the juror, and any argument that he was not rehabilitated is waived. *See Belcher v. State*, No. 82255, 2022 WL 1261300, at *3 (Nev. Apr. 27, 2022) (Order of Affirmance) (concluding that an objection not reraised on appeal is waived); *see also Powell v. Liberty Mut. Fire Ins. Co.*, 127 Nev. 156, 161 n.3, 252 P.3d 668, 672 n.3 (2011) (holding that arguments not raised in appellant's opening brief are waived).

---

was, it was not prejudicial because the conduct "merely demonstrate[d] that the jury was sympathetic to an innocent child, who was a collateral victim of the murder." *Id.* at 522, 50 P.3d at 1107. *Hernandez* dealt solely with the issue of juror misconduct and possible prejudice resulting therefrom, which is subject to abuse of discretion and harmless error review, *see id.*, as opposed to the failure to remove a biased juror, which (if proven) is reversible error. *See Sanders*, 131 Nev. at 511, 354 P.3d at 208 ("Under Nevada law, when a failure to remove a biased juror results in an unfair empaneled jury, the error is reversible.").

In any event, the jurors were properly instructed that "[a] verdict may never be influenced by sympathy, prejudice or public opinion" and jurors are presumed to follow district court orders and instructions. *Summers v. State*, 122 Nev. 1326, 1333, 148 P.3d 778, 783 (2006). Therefore, we conclude that the district court did not abuse its discretion in denying Young's motion for a mistrial and in not removing the juror.

*The district court did not err by not immediately stopping Young from arguing and challenging the juror's conduct in the presence of that juror*

Young argues that the district court failed to ensure that juror no. 11 was not present when Young challenged his partiality. He argues the district court should have excused the juror before the argument commenced because his presence during the argument put Young in an antagonistic position with the juror for the remainder of the trial. The State argues that Young did not raise this issue below and it is waived.

We conclude that Young invited any possible error that may have occurred because defense counsel caused the issue he now raises on appeal. Specifically, Young began arguing and challenging the juror's impartiality while the juror was present, and the district court attempted to direct his argument toward the court. The court stepped in to stop defense counsel from further arguing. We decline to consider Young's argument given his counsel's role in the alleged error. *Cf. Belcher v. State*, 136 Nev. 261, 275, 464 P.3d 1013, 1028 (2020) (concluding that a party cannot challenge on appeal as error testimony which that same party invited, induced, or provoked).

However, even if we consider the argument, because Young did not raise the issue below, it was waived, and we can only review for plain error. *See Jeremias*, 134 Nev. at 50, 412 P.3d at 48. Under plain error review, we conclude that Young fails to offer any cogent argument or

Court of Appeals
OF
Nevada

(O) 1947B

27

authority that a substantial right was affected. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) (explaining that this court need not consider an appellant's argument that is not cogently argued or lacks the support of relevant authority). Therefore, Young has not demonstrated plain error.

*The district court misstated the law in jury instruction number 10—all other challenged jury instructions were accurate statements of the law*

Young argues that five jury instructions were misstated and that this court should reverse counts 1, 2, 7, 8, 9, and 10 under a plain error review. The State concedes, and we agree, that jury instruction number 10 misstated Nevada law regarding when property is deemed taken "from the person" for purposes of a conviction for larceny from the person, and the conviction for count 2 should be reversed.

A district court holds broad discretion in settling jury instructions. *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001). A district court's decision to proffer a particular instruction to the jury is reviewed on appeal for an abuse of discretion. *Id.* "An abuse of discretion occurs if the district court's decision is arbitrary or capricious or if it exceeds the bounds of law or reason." *Id.* Additionally, when a party fails to object to or request a jury instruction, appellate review is precluded "unless the error is patently prejudicial," thus requiring "the court to act sua sponte to protect the defendant's right to a fair trial." *McKenna*, 114 Nev. at 1052, 968 P.2d at 745; *Green*, 119 Nev. at 545, 80 P.3d at 95; *see also Flanagan v. State*, 112 Nev. 1409, 1423, 930 P.2d 691, 700 (1996).

The erroneous larceny-from-the-person instruction given as instruction 10 allowed the jury to convict even if the property taken was not physically connected to the victim in some way. It stated, "Property is deemed taken 'from the person' of the victim if the property was within the

victim's reach, inspection, observation, disposition or control." Such an instruction is clearly wrong. Further, the evidence regarding count 2 did not show that Campo's wallet was taken from her person, and Campo's testimony failed to establish exactly where her purse was located before her wallet was taken from it, but the purse was not on her person. Therefore, we reverse Young's conviction for larceny from the person related to the theft of Campo's wallet (count 2) because of the improper instruction and because the evidence does not show that Campo exerted control over her purse when Young took her wallet.

However, as to the remaining larceny-from-the-person convictions, the evidence established that Young took property from the person of the victims when he stole their wallets from either a purse held on the victims' person or worn as a backpack. Therefore, we see no basis to reverse the remaining larceny-from-the-person convictions because of the erroneous instruction. To avoid instruction error going forward, district courts should consider the recently adopted Nevada Pattern Jury Instructions: Criminal in settling jury instructions. As pertinent here, the pattern jury instruction for larceny from the person includes the following language:

> The crime of LARCENY FROM THE PERSON consists of the following elements:
>
> (1) The Defendant takes the property;
>
> (2) From the person of another;
>
> (3) Without the person's consent;
>
> (4) With the intent to steal or appropriate the property to his or her own use.
>
> . . .
>
> The crime of larceny from the person does not require violence, force, or fear, but does require an

actual taking from the person of another. The crime is not committed if the property is taken only from a person's immediate presence, or from a person's constructive control or possession.

Property is taken "from the person of another" if it, at the time of the taking, is in some way actually upon or attached to the person, or carried or held in actual physical possession, such as clothing, apparel, or property held or carried in the hands, or by other means, upon the person, or things contained therein, or attached thereto.

. . . .

Nevada Pattern Jury Instructions: Criminal § 15.06 (State Bar of Nevada 2023).

Still, Young's conduct not only resulted in the larceny of the other victims' property, but he also invaded their privacy, which is the "gravamen of the offense" of larceny from the person. *See Terral v. State*, 84 Nev. 412, 414, 442 P.2d 465, 466 (1968) (holding that the essence of the crime of larceny from the person "is that the person of another has been violated and" the person's privacy directly invaded); *see also Ibarra v. State*, 134 Nev. 582, 589, 426 P.3d 16, 22 (2018) (concluding the "objective" of NRS 205.270 is "discouraging theft that carries an unacceptable risk of violating the victim's . . . privacy"). We analyze the remaining larceny-related convictions next.

*Instruction number 10 (larceny from the person)*

Young contends that the larceny-from-the-person convictions related to the thefts of Hatcher's and Frank's wallets, and the associated burglary convictions, should be reversed based on the misstatement of law in jury instruction number 10. Young contends that Hatcher and Frank testified that their wallets were stolen out of their purses, which were on or close to their bodies, and that but for the error in the instruction, jurors may

have concluded that the theft of their wallets was too far removed to constitute larceny from the person. According to Young, if jurors did not find sufficient proof to convict Young for the larceny-from-the-person charges, then they may not have found proof for the associated burglary convictions. We disagree.

The larceny-from-the-person convictions related to the wallet thefts of Hatcher and Frank are valid because Young took those wallets from the person of the victims. Though Young contends that taking a wallet from the purse of a victim is too attenuated to constitute a taking "from the person," the Nevada Supreme Court has held that similar type of conduct is the type of conduct NRS 205.270 seeks to punish. *See Terral*, 84 Nev. at 414, 442 P.2d at 466 (holding that "[i]t is important to restrict the coverage of NRS 205.270 to pickpockets, purse snatchers . . . and the like"). These notions were again articulated in the supreme court's decision in *Ibarra*. *Ibarra* labeled *Terral* "[t]he seminal Nevada case interpreting the" requirement that larceny from the person requires the taking of property from the person of another. 134 Nev. at 588, 426 P.3d at 21. The supreme court underscored that "pickpockets, purse snatchers . . . and the like resemble one another" because they all "take property from the person of their victim." *Id.* (quotation marks omitted). Stealing wallets from victims like Hatcher and Frank, who were carrying their purses, invaded their privacy and undoubtedly falls within the conduct prohibited by NRS 205.270. Thus, we affirm the larceny-from-the-person convictions related to the Hatcher and Frank wallet thefts.[6]

_____

[6]As noted, the correct jury instruction under the Nevada Pattern Jury Instructions: Criminal is section 15.06, defining larceny from the person. Further, under NRS 175.161(3), "[e]ither party may present to the court any

COURT OF APPEALS
OF
NEVADA

(O) 1947B

31

We also decline to reverse the associated burglary charges, as Young fails to demonstrate plain error or present proof that the instruction was patently prejudicial. A burglary offense is complete when the perpetrator unlawfully enters or remains in a dwelling or other building with the specific intent required by the statute. *See Funderburk v. State*, 125 Nev. 260, 263, 212 P.3d 337, 339 (2009); *Carr v. Sheriff*, 95 Nev. 688, 689-90, 601 P.2d 422, 423 (1979); *see also* NRS 205.060(1) (providing that burglary requires that a person unlawfully enter or remain in a business "with the intent to commit grand or petit larceny . . . or any felony"). Given the testimony from multiple LVMPD officers and employees that Young entered the businesses and later attempted to fraudulently use the victims' cards, it is clear beyond a reasonable doubt Young unlawfully entered and/or remained in those businesses with the requisite intent. Young's specific intent is further evident from the officers' testimony that Young did not purchase any items or gamble at the casinos when he entered the Walmarts, other stores, and various hotels and casinos to steal wallets, nor did he otherwise behave like a consumer or a patron. Thus, we conclude that the associated burglary convictions are not impacted by the erroneous jury instruction, and we decline to reverse those convictions.

*Instruction numbers 13 and 14 (lesser offenses)*

Young argues that the district court's instructions guiding the jury to consider lesser-included offenses improperly relieved the State of its burden of proof in violation of Young's due process rights. The district court

___

written charge, and request that it be given. If the court believes that the charge is pertinent and an accurate statement of the law, *whether or not the charge has been adopted as a model jury instruction*, it must be given." (Emphasis added.)

recited transition instructions for grand larceny and petit larceny (number 13) and for larceny from the person and larceny (number 14).[7] Young argues that the language used suggested that all 12 jurors must reject the greater offenses before they could consider the lesser offense. We again disagree and conclude that both transition instructions comport with due process and that Young has not shown plain error. *See Jeremias,* 134 Nev. at 50, 412 P.3d at 48.

We note first that Young offered or requested these instructions. Therefore, any possible error was invited by him and need not be considered. *Cf. Jones v. State,* 95 Nev. 613, 618, 600 P.2d 247, 250 (1979) (holding that the appellant was estopped from raising any objection on appeal regarding the admission of incriminating information because his attorney elicited the details of the incriminating information during cross-examination); *see also Belcher,* 136 Nev. at 275, 464 P.3d at 1028 (concluding that a party cannot challenge on appeal as error testimony which that same party invited, induced, or provoked).

---

[7]Instruction number 13 stated the following:

> You shall find the defendant guilty of Petit Larceny if:
>
> 1. Some of you are not convinced beyond a reasonable doubt that the defendant is guilty of Grand Larceny and
>
> 2. All twelve of you are convinced beyond a reasonable doubt the defendant is guilty of the crime of Petit Larceny.

The larceny-from-the-person and larceny transition instruction used substantially similar language.

Regardless, the instruction on the lesser offenses did not constitute plain error because the language did not require all jurors to agree that Young was not guilty of grand larceny as a condition precedent to finding him guilty of petit larceny. Additionally, given the overwhelming evidence of theft establishing Young's guilt, there was no actual prejudice resulting from the district court's instruction on the lesser-included offenses.

Finally, Young mischaracterizes the instruction given by the district court based on the Nevada Supreme Court's holding in *Green*, 119 Nev. 542, 80 P.3d 93. The instruction given by the district court followed the "unable to agree" approach explained in *Green*, and the instruction does not expressly require unanimous agreement on acquittal by the jury. *See id.* at 545-46, 80 P.3d at 95. The supreme court adopted the "unable to agree" instruction approach as the "correct transition instruction"; therefore, the instruction comports with *Green*. *See id.* at 547-48, 80 P.3d at 96-97. The transition instructions thus align with the supreme court's adopted approach because the instructions required that one or more jurors find Young not guilty of grand larceny and that all jurors agree that Young was guilty of petit larceny. We note also that count 3 charged grand larceny by stealing $1400 from Mary Campo, and Young does not argue that the amount stolen was less than $650 making the offense petit larceny.[8] Thus, we conclude that Young has not demonstrated plain error with regard to

---

[8]By failing to challenge the grand larceny charge as to the amount stolen from Campo that is the basis for count 3, Young's argument regarding the transition instruction is meritless considering that Young would have been guilty of grand larceny, as opposed to petit larceny, regardless of any alleged instruction error.

the transition instructions, and we decline to reverse Young's convictions related to these instructions.[9]

*The State presented sufficient evidence to sustain Young's convictions*

Young argues that the State failed to present sufficient evidence to sustain his convictions because neither the victims nor the store employees who testified identified him as one of the men in the wallet thefts. Young also argues that the burglaries occurred in commercial establishments where an individual could "have a multitude of intentions upon entry."

A challenge to the sufficiency of the evidence asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Rose v. State*, 123 Nev. 194, 202, 163 P.3d 408, 414 (2007) (emphasis and quotation marks omitted). A jury's verdict will remain undisturbed when it is supported by substantial evidence. *Cunningham v. State*, 94 Nev. 128, 130, 575 P.2d 936, 937 (1978).

---

[9]Young also challenges jury instruction numbers 22 and 23, which instructed the jury on the presumption of innocence and on determining Young's guilt or innocence only on the evidence from the case. We decline to reverse any convictions based on Young's challenges to these instructions under plain error review because the Nevada Supreme Court has previously deemed identical instructions appropriate. *See Blake*, 121 Nev. at 799, 121 P.3d at 580 (holding that use of the word "until" in instructing the jury that "[t]he Defendant is presumed innocent until the contrary is proved" did not suggest that appellant's guilt would eventually be proven because the instruction, read as a whole, also "plainly contemplated that guilt might not be proven"); *Guy v. State*, 108 Nev. 770, 778, 839 P.2d 578, 583 (1992) (holding that use of "guilt or innocence" language was "appropriate and necessary" because it instructs the jury to ignore the culpability of other suspects or partners in the criminal acts when deciding whether the appellant is guilty as charged).

It is the function and responsibility of the jury, not the court, to evaluate "the weight of the evidence and determine the credibility of witnesses." *Rose*, 123 Nev. at 202-03, 163 P.3d at 414 (quotation marks omitted). In considering the totality of the State's evidence in the light most favorable to the prosecution—video evidence depicting Young engaging in many wallet thefts and the testimony of several LVMPD officers who identified Young based on several factors depicted across all theft incidents, including his clothing, shoes, and jacket around his arm—the evidence supports the jury's verdict that Young committed the theft-related offenses. The same applies to the evidence establishing the burglary offenses.

This overwhelming evidence supports the jury's verdict, and we uphold Young's convictions. Officers testified that the videos showed Young entering the businesses working in tandem with an accomplice to steal wallets. One of the men would function as a distractor, neither of the two entered the businesses as customers, the two would immediately leave after taking the wallets, and Young, who walked with an unusual gait, would enter nearby stores after taking the wallets to fraudulently use the stolen cards. Therefore, we conclude that a rational juror could find the evidence sufficient to support Young's convictions.

*Whether Young received ineffective assistance of counsel at sentencing*

Young argues that he received ineffective assistance of counsel at his sentencing because his counsel failed to raise any argument regarding the sufficiency of Young's prior convictions and did not offer any argument that could have mitigated Young's sentence. We decline to address this issue on the merits, as Young has not satisfied any exceptions that would

allow him to raise this issue on direct appeal.[10] *See Archanian v. State*, 122 Nev. 1019, 1036, 145 P.3d 1008, 1020-21 (2006).[11]

## CONCLUSION

Based on the foregoing analysis, we conclude that the district court did not err in allowing juror no. 11 to remain on the jury panel when the juror's statement suggested actual bias because the district court undertook efforts to rehabilitate the juror and found him to be impartial, and Young does not challenge the district court's rehabilitation efforts on appeal.

---

[10]Young raises two arguments related to the district court's adjudication and sentencing of him as a habitual criminal. First, Young argues that the district court should have held a separate hearing before sentencing him as a habitual criminal, as required under NRS 207.016. Second, Young argues he was entitled to a separate jury trial regarding the State's habitual criminal allegations. However, in 2007, in a separate criminal appeal concerning a conviction for larceny from the person and sentencing under the habitual criminal statute, Young raised similar arguments regarding the application of the habitual criminal statute, and the Nevada Supreme Court issued an order affirming Young's conviction and sentence. *See Young v. State*, Docket No. 47936 (Order of Affirmance, June 27, 2007) (unpublished disposition). Further, we conclude that Young forfeited these claims, as he failed to raise them below, *see Jeremias*, 134 Nev. at 52, 412 P.3d at 49, and even if we considered each argument, Young fails to demonstrate plain error by the district court as to either issue. *See id.* at 50, 412 P.3d at 48.

[11]Young additionally argues that cumulative error warrants reversal of the jury's convictions. However, we conclude that the district court did not commit any error other than the error in giving jury instruction number 10. In light of the existence of only one true error by the district court, we decline to reverse based on this argument. *See Belcher*, 136 Nev. at 279, 464 P.3d at 1031 (concluding that cumulative error requires multiple errors).

However, we conclude that the district court gave an incorrect jury instruction as to the larceny-from-the-person charges and Young's conviction under count 2 must be reversed. We offer the correct wording for an instruction for larceny from the person based upon the Nevada Pattern Jury Instructions: Criminal. Nevertheless, the jury instruction error did not undermine the guilty verdicts for the other similar charges. Further, we find no reversible error as to any of Young's other convictions or his sentence based upon his arguments. Thus, we affirm the judgment of conviction as to all counts except count 2 and reverse and remand for the district court to strike count 2 from the judgment and enter an amended judgment.

_____, C.J.
Gibbons

We concur:

_____, J.
Bulla

_____, J.
Westbrook